BOMARKO, INC., et al., Petitioners,

v.

INTERNATIONAL TELECHARGE, INC., Respondent.

Bomarko, Inc., et al., Plaintiffs,

v.

Ronald J. Haan, et al., Defendants.

C.A. Nos. 13052, 14727.

Court of Chancery of Delaware, New Castle County.

Submitted: Aug. 20, 1999.
Decided: Nov. 4, 1999.
Revised: Nov. 16, 1999.

Ronald A. Brown, Jr. (argued) of Prickett, Jones, Elliott & Kristol, Wilmington, Delaware, for plaintiffs/petitioners.

Lewis H. Lazarus, Michael A. Weidinger, Morris, James, Hitchens & Williams, Wilmington, Delaware, Michael R. Klein (argued), Leon B. Greenfield, Wilmer, Cutler & Pickering, Washington, D.C., for defendants/respondent.

## OPINION

LAMB, Vice Chancellor.

### I. INTRODUCTION

This is a consolidated appraisal and breach of fiduciary duty action filed in connection with a March 1993 merger in which the shares of International Telecharge, Inc. ("ITI" or the "Company") were cashed-out for $0.30 per share and ITI was merged into a corporation wholly-owned by Ronald J. Haan, ITI's chairman and CEO. Plaintiffs/petitioners, consisting principally of James D. Azzar and entities owned by Mr. Azzar, owned 2,181,682 shares or 10.8% of ITI's issued and outstanding shares as of the record date for the Merger. Plaintiffs perfected their appraisal rights in accordance with § 262 of the Delaware General Corporation Law ("DGCL").

After taking discovery in the appraisal action, the plaintiffs filed a fiduciary duty action against Haan and corporations that he controls, claiming that the Merger was the product of a breach of fiduciary duty. The appraisal and fiduciary duty actions were consolidated for discovery purposes and, later, for trial, which was held on October 19–20, 1998. Post trial briefing was completed and argument heard on July 16, 1999. After receipt of certain additional briefing requested by the court, the matter was submitted.

I now conclude that the defendants have failed to carry their burden of proving the entire fairness of the Merger and award damages in the amount of $1.51 (plus interest) per share against the defendants, jointly and severally. I do not decide the appraisal action, as it is unnecessary to do so.

## II. BACKGROUND

### A. The Parties

ITI was a long-distance telephone company providing live and robotic operator assisted ("0+") telephone services, primarily through subscribing locations such as hotels, motels and privately owned pay phones. After deregulation of the telecommunications industry and the break-up of AT & T in the mid–1980's, companies such as ITI recognized the opportunity to enter the long distance business in competition with AT & T by offering to pay the owners of subscribing locations or pay phones a commission based on call revenue. The chance to earn these commissions caused many hotel and pay phone owners to switch their service contracts from AT & T (which at first refused to pay commissions), resulting in substantial revenues and profits for the fledgling 0+ companies.

ITI faced competition from other independent 0+ providers, such as Telesphere, Inc. and National Telephone Services, Inc. ("NTS"), a private company acquired by Haan in 1987. Over time, the 0+ market also faced increased competition from mainstream ("1+") telephone service providers, such as AT & T, MCI and Sprint, who developed new business strategies to stem the flow of business to the 0+ market.

Haan became involved in the 0+ market in 1987 when he purchased a controlling interest in NTS. Seeking to achieve a consolidation of companies in that business, Haan approached ITI regarding a possible merger in late–1988 and again about a year later. Both times, ITI's "reception was lukewarm." Although he realized that competitive pressures would create significant strain for 0+ companies, Haan thought those companies could survive in the long term, if consolidated and properly financed.

### B. Haan Obtains an Interest in Telesphere

NTS and Telesphere jointly suggested merger discussions with ITI in early 1990. ITI again indicated a preference to stay independent. Shortly thereafter, Haan sold NTS to Telesphere for a combination of cash, notes and Telesphere stock. When Telesphere/NTS ran into financial difficulty in January 1991, Haan reinvested a portion of the proceeds from the sale of NTS and, in return, became Telesphere's president and CEO and its largest stockholder.

### C. Haan Buys the MCI Note and Obtains an Equity Interest in ITI

ITI, like Telesphere, was experiencing severe cash shortages during 1991 and was in default on a $21 million note to MCI. Within days of becoming Telesphere's CEO, Haan contacted Robert E. Lund, ITI's then CEO, to discuss a possible merger. ITI continued to show no interest in a merger. Seeing an opportunity to gain influence over ITI, Haan sold Telesphere's 1+ segment to MCI in exchange for the $21 million ITI/MCI note. Telesphere thus became ITI's largest creditor, with the ability to exercise remedies in default. Holding this powerful bargaining chip, Haan approached Lund again and, in March 1991, they agreed on the basic terms of an ITI–Telesphere merger. However, Haan "ran into a disagreement with the board [of Telesphere] and the banks about the merger" and the transaction fell through. Haan resigned from his position at Telesphere. Shortly thereafter, Telesphere was forced into bankruptcy.

Haan perceived that Telesphere's bankruptcy and ITI's continued financial distress presented an opportunity for him

finally to obtain control of ITI. ITI needed a cash infusion quickly, and Haan believed the combination of ITI's and Telesphere's customer bases and other operator services assets could result in the economies of scale necessary for ITI to survive. Moreover, reacquiring the ITI/MCI note on favorable terms would significantly ease ITI's longer term financial problems.

Anticipating that Haan would be able to purchase the assets out of the Telesphere bankruptcy estate, Haan and ITI entered a Memorandum of Agreement dated October 13, 1991, as later amended (the "MOA"), which contemplated that Haan would invest $4.0 million to purchase 2,909,091 ITI shares for $1.375 per share.[1] Haan would also obtain the right to designate a majority of ITI's directors. Haan agreed to sell the Telesphere operator service assets and the ITI/MCI note to ITI for substantially the same price he paid.[2] Finally, Haan bargained for a warrant, subject to prior shareholder approval, giving him the right to purchase enough shares to become ITI's majority shareholder.

ITI engaged the investment banking firm of Oppenheimer & Co. to render an opinion as to the fairness of the transaction. Oppenheimer conducted a valuation of the business and concluded that the equity investment, combined with the other consideration offered, was, taken as a whole, fair to the shareholders of ITI.

### D. The WilTel Agreement and the $8 Million Payment to Haan

Haan learned that Williams Telecommunications, Inc. ("WilTel"), a network services provider, planned to bid on the Telesphere assets, primarily to acquire network services assets that were of no interest to ITI. Haan met with WilTel and, eventually, structured an agreement pursuant to which Haan would bid on all the Telesphere assets, without competition from WilTel, and sell to WilTel the assets it wanted. At some point in the negotiations, Haan and WilTel discussed the mutually beneficial prospect of Haan arranging for ITI to switch its network services provider from MCI to WilTel. Thus, ITI might obtain a more favorable network services agreement and WilTel would have a substantial new customer for its network services business. Although not yet formally an officer or manager of ITI, Haan undertook to negotiate with WilTel on ITI's behalf.

WilTel agreed to pay $5 million for the Telesphere network services assets, which is approximately what Haan paid for them, plus an added $8 million to Haan if ITI switched from MCI to WilTel as its network services provider. At the October 21, 1991 Telesphere bankruptcy hearing, Haan testified about the transaction with WilTel, stating, "I am agreeing to sell the one plus base and network assets to [WilTel] for $5 million. And then I am also arranging for [WilTel] to get the additional traffic generated by ITI in payment to me [of] $8 million." ITI representatives were present at this hearing but unable to hear Haan's testimony.

Haan became an ITI director and board chairman on October 24, 1991. At a No-

---

1. The original MOA provided for Haan to pay $4 million to purchase 8,000,000 ITI shares plus warrants for additional shares to be calculated pursuant to a predetermined formula. The number of shares sold directly was changed to 2,909,091 and the warrant calculation adjusted accordingly in order to pre-

serve a net operating loss carry forward belonging to ITI.

2. By purchasing the assets with his own cash and selling assets to ITI in return for a note, Haan actually loaned to ITI the funds needed to make the asset purchase.

vember 12 meeting, the board elected him CEO, with Lund staying on as president. At that same meeting, Haan presented the proposed ITI–WilTel network services agreement that had been negotiated on behalf of ITI by Haan and his personal counsel. In making that presentation, Haan did not disclose the $8 million payment he expected to receive from WilTel for securing ITI's participation in that agreement. Unaware of Haan's interest, the Board approved the agreement. WilTel made good on its promise and paid Haan $8 million.

### E. ITI's Special Committee Declines to Take Action Against Haan

Several months later, the Board became aware of the $8 million payment to Haan. Concerned about the legality of that payment, the Board appointed a special review committee comprised of the ITI directors other than Haan. Wilmer, Cutler & Pickering, later hired to represent Haan and the other defendants in these actions, were retained as legal counsel to the special review committee.

The special review committee's report (the "Report"), dated June 15, 1992, concludes that Haan probably owed fiduciary duties to ITI beginning on October 13, 1991, when he signed the MOA. According to the Report, "Haan's shareholdings (which were greater than the holdings of any other shareholder or shareholder group), his right to name a majority of the Board, and his *actual control* of ITI gave him a controlling position." (emphasis added). The Report also acknowledges that Haan clearly owed fiduciary duties at the November 12 board meeting, when he was ITI's board chairman and CEO and presented the proposed ITI–WilTel agreement to the board of directors.

After discussing Haan's duties of loyalty and the conflict of interest raised by the $8

million payment, the Report states that the ITI–WilTel Agreements were fair to ITI and that Haan energetically advanced ITI's interests. Consequently, the Report finds no harm to ITI as a result of Haan's accepting the $8 million payment.

The Report identifies various instances of insufficient disclosure by Haan of his agreement with WilTel. However, upon finding that Haan did not seek to conceal the information and that it was not unreasonable for Haan to assume the board knew of the particulars of his deal with WilTel as disclosed by him in bankruptcy court, the Report concludes that this was not a clear violation of Haan's duties to ITI. However, because "the Board was not aware of all material facts concerning the terms of the Haan–WilTel Agreement when it approved [the ITI–Haan and ITI–WilTel agreements], the Board's approval of those agreements was arguably ineffective under section 144(a)(1) of the Delaware Code." Although Haan "showed a lack of sensitivity to actual and apparent conflicts of interest and to his disclosure obligations as a corporate fiduciary ... ITI was not adversely affected by WilTel's payment to Haan". Thus, the Report recommends that the ITI Board ratify the ITI–Haan and ITI–WilTel agreements. The ITI directors (Haan abstaining) did so on June 19, 1992.

### F. ITI Obtains Interim Financing from PNB

Like many businesses, ITI needed a satisfactory, long-term accounts receivable financing source to ensure predictable cash flow. In September 1991, prior to Haan's investment, ITI hired the consulting firm of Kane & Co. to search for a financing solution. After becoming the Company's chairman and CEO, Haan provided ITI with interim financing relief by buying out ITI's existing source of receivables financ-

ing and providing more favorable terms to the Company.

Kane identified Bell Atlantic Tricon Leasing Corp. as a potential financing source. Unlike many bank lenders, who did not understand the nature of ITI's business and receivables, Bell Atlantic was experienced and knowledgeable in the industry. Also, Bell Atlantic knew the 0 + market segment and knew Haan because it had provided receivables financing to NTS while Haan was involved with that corporation.

Before discussions with Bell Atlantic matured, Thomas Hyatt, ITI's Chief Financial Officer fired Kane to save money. Although Hyatt told Kane that ITI had "obtained receivables financing elsewhere," this statement was untrue at that time. About a month after firing Kane, ITI obtained a 90–day loan from the Pittsburgh National Bank ("PNB"), guaranteed by Haan, made in contemplation of entering into a long-term relationship.

## G. PNB Declines to Provide Long–Term Financing

On April 10, 1992, PNB sent a letter to Hyatt refusing to continue its involvement with ITI, explaining that ITI had not been responsive or cooperative in PNB's efforts to structure longer term financing. Hyatt testified that PNB's reluctance to continue its relationship with ITI was due entirely to PNB's fear that if ITI filed for bankruptcy, its creditors would sue PNB under certain lender liability theories. Although the PNB line was set to expire on April 22, 1992, PNB agreed to extend the term until June 24, 1992. Haan extended his guarantee as well.

At the end of March, realizing that PNB would not become ITI's long-term financing source, Hyatt renewed contacts with Bell Atlantic, sending to it a package of financial information and copies of the

PNB loans to Bell Atlantic. He did not recontact Kane at this time.

## H. ITI Misses its Projections

When the actual first quarter results became available, Hyatt saw that ITI was not meeting its financial projections. Revenues were significantly short of expectations, and expenses were higher. On May 12 and 13, Hyatt met with Haan and others to discuss the poor results. According to Hyatt, this "was a wake-up meeting" for Haan. Haan then took a more active role in the Company's daily management and implemented drastic cost-cutting measures. The poor financial results also caused ITI to go into technical default on its long-term debt. Thus, ITI needed both to obtain a dependable source of receivables financing and a rearrangement or restructuring of its long-term debt.

## I. Bell Atlantic Sends a Term Sheet

The deteriorating financial picture complicated ITI's efforts to secure a source of financing to replace PNB. On May 14, 1992, Hyatt and Haan met with Alexander Cole and Jay Silverstein of Bell Atlantic to discuss ITI's need for receivables financing. During the meeting, Hyatt asked for $40–45 million in financing. Cole and Silverstein stated that Bell Atlantic contemplated a loan in the $20 million range. ITI's expedited schedule (necessitated by the June 24 expiry of the PNB loan), as well as the need for credit support in the form of a guarantee from Haan, were concerns for Bell Atlantic. At the meeting, Haan stated that he would not guarantee the loan.

Later that day, Bell Atlantic sent a new proposed term sheet to Haan's attention. This term sheet proposed a three-year secured $40 million credit line. The term sheet also called for Haan's guarantee of

the loan, collateralized by a $5 million certificate of deposit and proposed that all debt due Haan by ITI be subordinated to Bell Atlantic's secured credit line. Finally, the term sheet called for a restructuring of ITI's other liabilities in a fashion acceptable to Bell Atlantic. Haan never disclosed the existence of this term sheet to the board of directors and may never even have shown it to Hyatt.

### J. The Board Meets on May 18

#### 1. Informing the Board of ITI's Troubles

ITI's directors met on the morning of May 18, 1992. Hyatt reported on the state of the Company's finances, including its search for receivables financing. Hyatt's report, discussing the Company's imminent bankruptcy risk, indicated that the Company's revenues and profits had not improved in line with expectations from late 1991. He also discussed the May 14 meeting with Bell Atlantic and reported the low likelihood that Bell Atlantic would provide financing. According to the minutes of the meeting, Hyatt indicated "that Bell Atlantic had expressed some limited interest in providing receivables financing but were not willing to commit to the maximum amount the Company needs. They are looking to find a partner to join with them in providing financing, but will probably not be able to meet the June 24 date."

It appears that Hyatt either was unaware of the terms of the $40 million line of credit proposed by Bell Atlantic to Haan after the May 14 meeting or chose not to discuss those terms with the Board. In either case, Hyatt's "report was fairly grim." Without a plan to replace the PNB facility by the time it expired in late June, the directors concluded that ITI faced the very real possibility of a Chapter 11 bankruptcy filing.

#### 2. The Board's Response: Creating a Special Committee to Find a Source of Financing or Otherwise Save the Company

At this same meeting, Haan suggested that he might make a proposal to provide financing or to purchase ITI's assets. He did not discuss details.

The ITI directors recognized that Haan's position (significant creditor, large stockholder, CEO and Chairman) and his interest in making a further proposal to the Company required that he not participate in the Board's pursuit of alternative strategies. Thus, the directors voted at the May 18 meeting to establish a committee consisting of the three Board members other than Haan (the "Special Committee") and charged that committee with the task of searching for alternative sources of financing or alternative transactions for ITI. The Special Committee was directed to investigate and make decisions on all potential options, including, but not limited to:

- a sale of assets;
- a new source of financing;
- an investment or equity infusion; and, failing all else
- a voluntary bankruptcy filing.

The Special Committee was given the power to retain professionals and experts to assist in its work. Lund was named chairman. The Board instructed Hyatt to assist in all aspects of the Committee's work.

The committee's goal of finding *any* alternative to bankruptcy was due to the Board's understanding that a bankruptcy filing would destroy the Company and result in no recovery for the common stockholders or the unsecured creditors. In the event of a bankruptcy filing, ITI's customers (pay phone owners, hotel owners and others) could easily and quickly switch to

another 0+ service provider, severely affecting ITI's revenues and profits. Hyatt likened ITI's business to an ice cream cone, opining that if ITI filed a voluntary bankruptcy petition, it "would just melt. There would be nothing left."

Indeed, the perception at the time was that a bankruptcy filing would prove disastrous for all involved. Not only would the stockholders and unsecured creditors get nothing, but the secured creditors would recoup "certainly less than $0.10 on the dollar" out of a Chapter 11 proceeding.

## K. Haan Contacts Bell Atlantic Without the Special Committee's Knowledge

Hours after the May 18 board meeting, Haan (without Hyatt) telephoned Cole and Silverstein of Bell Atlantic, after which he faxed to them a letter typed *on ITI letterhead* and signed by him in his capacity as CEO. This letter, reasonably interpreted by Bell Atlantic as ITI's "response and counterproposal for the terms and conditions of the [May 14] proposal," proposed financing terms that were markedly different from Bell Atlantic's May 14 term sheet as follows:

- The borrower would be ITI *or any successor to ITI's interests or assets;*
- The counterproposal contemplated *a $20 million facility;*
- Haan would guarantee the full amount of the facility;
- Closing on September 15, 1992, as opposed to August 15, 1992.

Besides differing from Bell Atlantic's May 14 term sheet, Haan's "counter-proposal" set out terms materially inconsistent with ITI's needs. Although the board earlier that day agreed that a $20–25 million facility would not suffice, Haan requested only $20 million. Despite the impending termination of the PNB loan, Haan's request *moved the closing date back by 30 days.* Also, Haan told the board that he would not guarantee the facility but then proposed to Bell Atlantic to do just that.

This contact between Haan and Bell Atlantic is centrally important to plaintiffs' case for two reasons. First, the Special Committee never learned about it. Second, Haan's conduct interfered with whatever opportunity ITI had to obtain financing from Bell Atlantic.

Lund testified at trial that the Special Committee expected Hyatt to continue efforts to obtain financing from Bell Atlantic. Although Hyatt claimed at trial that he stayed "in touch" with Bell Atlantic after May 18 and reported those contacts to the Special Committee, his testimony is not supported by the evidence. To start with, the minutes of the June 3, 1992 meeting show Hyatt telling the Special Committee that Bell Atlantic's position was unchanged from that reported by him on May 18. The minutes reflect no mention of either the May 14 Bell Atlantic term sheet or Haan's May 18 "counterproposal." How could Hyatt have been in contact with Bell Atlantic without learning about those things?

At his deposition, Hyatt was unable to recall any contacts with Bell Atlantic after May 18. He still had no recollection about this at trial. The best he could do was to state that because the minutes of the June 3 board meeting report him saying that he contacted Bell Atlantic between May 18 and June 3, he must have done so. While there is no reason to doubt the accuracy of the minutes in reporting what Hyatt said at the June 3 meeting, those minutes are not evidence of the truthfulness of Hyatt's report. Moreover, neither ITI nor Bell Atlantic produced *any* documentation evidencing any contact between Hyatt and

Bell Atlantic after May 14.[3] Finally, there is no evidence that any member of the Special Committee otherwise knew about Haan's contacts with Bell Atlantic. Instead, the evidence is that the members of that committee believed that Hyatt failed to make progress because Bell Atlantic was not willing to provide financing on terms that were possible for ITI to meet.

## L. Haan Proposes the Services Agreement

At the June 3, 1992 board of directors meeting, Haan proposed the framework for a sales, accounting and management services agreement, which eventually became known as the Services Agreement. Haan suggesting setting up an entity (named ONCOR) wholly-owned by Haan that would, acting as ITI's customer interface, manage most or all of ITI's operating assets, obtain new financing at better rates than those available to ITI and pay 50% of its revenues to ITI. Haan's professed goal in proposing the Services Agreement was to find a means for renegotiating and reducing ITI's long term debt. A related goal of the Services Agreement was to protect ITI's customer base from the "meltdown" which was feared in the event of a bankruptcy filing. By isolating the customer contacts in a separate corporation, ITI's business operations could survive in the shelter of ONCOR and the Services Agreement even if ITI was forced to file for bankruptcy.

At the June 19, 1992 Board meeting, the directors, after discussing certain efforts to find financing or an acquisition candidate, concluded that "[n]o other parties had shown any interest in acquiring the Company or financing its accounts receivable outside of Chapter 11." Haan then explained the structural details of the proposed Services Agreement. After further negotiation and document preparation, the board entered into the Services Agreement on June 28, 1992.

Lund testified that if ITI had received the Bell Atlantic financing, it would not have needed the Services Agreement. Further, Hyatt testified that with the Bell Atlantic financing, the Company would have avoided bankruptcy, at least for the time being. Hyatt also stated that if the Company had received the needed financing, it is reasonable to believe that it would have succeeded in restructuring its long-term debt.

## M. The Company Accepts the Merger Offer

The minutes of the June 3 board meeting reflect that Lund, in outlining Haan's proposal for the Services Agreement, told the board that "Ron Haan would set up another corporation and this corporation would agree to buy the shares of ITI stock from the ITI stockholders at a price to be agreed upon with ITI. Mr. Haan indicated that he would propose to offer [30 cents][4] per share as the purchase price of the ITI

---

**3.** Defendants argue that a June 8 letter to Bell Atlantic from Oberdorfer, one of Hyatt's subordinates, that included financial projections for Haan's proposed new entity, proves that Hyatt must have known about Haan's activities. I disagree. Hyatt's only testimony about the letter is that he must have received it because he saw the "cc" addressed to him. However, the letter was produced by Bell Atlantic and not ITI. In any case, whether

Hyatt saw the letter or not, the evidence is clear that Hyatt never told any member of the Special Committee about Haan's contacts with Bell Atlantic.

**4.** The minutes actually say "0.30 cents ($.03)" but it is clear from the context that Haan actually proposed to pay 30 cents ($0.30) at this meeting.

stock which he believed to be fair under the circumstances."

Although the evidence is contradictory, I believe it more likely that the Special Committee or its members, and not Haan, originated the idea of proposing a cash-out merger at the same time as the Services Agreement. Haan has consistently said that the other directors raised the idea with him. At their depositions, each of the Special Committee members contradicted this testimony, stating that Haan first raised the idea of a merger. At trial, however, Hyatt and Lund testified that the Special Committee insisted on the Merger when those directors realized that the Services Agreement so fundamentally altered the nature of ITI's business that the shareholders should be given the chance to "opt out." Defendants explain the inconsistent deposition testimony as the result of the witnesses confusing the Services Agreement and the Merger. This explanation is plausible.

Regardless of who suggested the Merger, the proposal for a cash-out merger was formally presented on June 3, 1992 and the $0.30 per share price established at that time. On July 23, 1992, the board executed a merger agreement among ITI, Long Distance Communications, Inc., a company wholly-owned by Haan, and its subsidiary, LDC Acquisition, Inc. That agreement was finally presented to the stockholders for their approval on March 23, 1993.

Sometime before the June 3 meeting, the Special Committee hired Stroock & Stroock & Lavan act as its outside counsel and Hale, Spencer, Stanley, Pronske & Trust, P.C. to advise on bankruptcy issues. Representatives of both law firms were present in person or by telephone at that meeting. The Special Committee also retained Kane to provide a fairness opinion on the Merger.

The proxy statement disseminated to ITI's shareholders indicates that Lund and Richardson "had several discussions with Haan concerning the price that Haan would be willing to pay" to buy out the minority shareholders. The depth and nature of these discussions is in doubt. While the depositions of Thomas, Richardson and Kane indicate that negotiations were minimal, the depositions and trial testimony of Lund and Hyatt suggest there were more substantial negotiations.

When asked how the merger price was set, Thomas indicated that the offer price "was roughly where the shares were trading at the time. May have even been above. But it was—the specific number was probably contained in the proposal from Haan." Asked whether he knew how Haan came up with the Merger price, Thomas stated, "If there was a calculation, I don't remember that.... From my view it was a number which reflected where the shares were trading in the market, so it was in the ballpark."

Although the proxy statement reported that Richardson was involved in "discussions" regarding the merger price, Richardson indicated that he was

... involved in negotiation, only in a, you know, limited sense because there wasn't extraordinary negotiations. Mr. Haan told us what he would do, what he was willing to do, and that seemed to be, you know, generally, the only alternative, the only viable alternative we felt we had rather than a bankruptcy.

Richardson stated that Hyatt, Lund and Elliot (the Company's in-house counsel) tried to get the best deal possible for the Company. However, he explained that since "there didn't seem to be a viable alternative, the negotiations ... were not held in what you might call a ... manner where you had two people who didn't have

to do a deal or could do it or could not do it."

Lund and Hyatt paint a somewhat different picture of the Merger negotiations. Lund, who was primarily responsible for negotiating with Haan, testified at trial that "there was a price of 25—at one point in time Mr. Haan offered us a price of $.25 a share and we were, through contingent negotiations, able to reach agreement on $.30 a share." As to the adequacy of the $0.30 per share price, Lund said that

> any price above a bankruptcy price was a fair price. I don't know if it was fair to the shareholders. I mean, the point is, I don't know what would have been fair to the shareholders. The fact that the company did not go into Chapter 11 and was the place we found ourselves in 1991 and 1992—and in my opinion still amazes me—and we would get a paltry sum of $0.30 a share for the shareholders, I would say, a yeoman's effort. Let's put it this way. I'm not saying it personally. I'm saying it was a very good price considering the situation.

Hyatt stated that the "negotiations were intense. My recollection is, Ron came in with an initial offering that was pretty low because of the financial status of the company, and eventually, as I recall it, it was $.30 is where it ended up in terms of the offering."

Neither party presented any documentary evidence of these negotiations. Taken as a whole, the record indicates that, due to ITI's weak bargaining position, negotiations were minimal.

## N. Haan's Contacts with Bell Atlantic Evidence Bad Faith

Based on the entirety of the record, I find that Haan's contacts with Bell Atlantic were intended to divert the opportunity to secure financing from Bell Atlantic away from ITI at the moment ITI most needed

it. Based on his trial testimony and the other evidence in the record, I find that Haan fully understood the impropriety of his conduct and affirmatively tried to conceal it from both the Special Committee and the plaintiffs in these actions.

Haan's secretive contacts with Bell Atlantic served no purpose other than to divert Bell Atlantic's attention away from ITI. After he sent the May 18 counterproposal requesting financing for ITI or any successor in interest to ITI's assets, Haan continued contacts with Bell Atlantic until after the Services Agreement was approved. On June 12, 1992, Haan conducted a telephone conference with Cole and Silverstein. Silverstein's notes of that conference indicate that Haan preferred a $15 million line of credit and instructed Bell Atlantic to revise its proposal letter. On June 29, Bell Atlantic sent a proposal to ONCOR, reflecting the substance of these conferences. Haan then abandoned the Bell Atlantic negotiations until after the Merger was completed.

At trial, Haan testified that he wanted to obtain Bell Atlantic's commitment as a "backup" to support his financing of ONCOR, purportedly to show the Special Committee that he could fund ONCOR's requirements under the Services Agreement. This is not credible for the simple reason that Haan never told the board of directors about his contacts with Bell Atlantic, and never disclosed Bell Atlantic's proposal to fund ONCOR. I conclude, instead, that Haan purposefully diverted Bell Atlantic from considering the financing required by ITI and then avoided raising suspicion by waiting until after the Merger was approved before signing a deal with Bell Atlantic.

Finally, my review of the record and observations at trial lead to the conclusion that Haan understood the wrongfulness of

his actions and attempted to conceal them, first from his fellow directors, then from ITI's shareholders and later from the plaintiffs in this case. At the June 3, 1992 board of directors meeting, Haan was present when Hyatt made his report about Bell Atlantic but failed to disclose his own contacts with Bell Atlantic. Haan also did not, at any later time, inform the board of those contacts. Nor did Haan cause the proxy statement distributed to the ITI stockholders in connection with the Merger to mention Haan's contacts with Bell Atlantic. Finally, neither Haan nor the Company produced any written evidence of Haan's 1992 contacts with Bell Atlantic in the course of discovery in these actions. Instead, the plaintiffs only learned of those contacts by serving a subpoena on Bell Atlantic. In my judgment, these facts justify the conclusion that the omission of all such documentation from the production made by Haan and ITI in these litigations was either intentional or a consequence of Haan's earlier efforts to conceal these contacts.[5]

## O. The Company Restructures its Debt

After the Services Agreement took effect on July 1, 1992, ITI's financial position improved. The Services Agreement, along with ITI's improved performance, gave ITI the leverage necessary to reach a restructuring agreement with its long-term creditors. According to Hyatt, the Services Agreement "became the hammer that we used on the creditors to renegotiate the debt because we had a solid firm, if you will, cash flow that we could predict to them, and we knew exactly what the cash would be."

Immediately prior to the Services Agreement, ITI's outstanding debt was approximately $90.5 million. In November 1992, the Company achieved its goal of restructuring its largest debt obligations with RHVI (Haan's wholly owned lending subsidiary), Northern Telecom and WilTel. NorTel insisted that Haan restructure his ITI debt proportionally with other creditors. WilTel also made its participation in the restructuring contingent on the participation of other creditors. Haan initially thought that he would not have to restructure his debt because he viewed his agreement to pay $5 million to the Company's shareholders in the Merger as providing some benefit to ITI. Eventually, he agreed to restructure his debt too, but he bargained for the right to terminate his participation in the debt restructuring in the event the Merger did not become effective. He did this because he believed that, as long as he became the Company's 100% owner through the Merger, he could recapture any debt forgiven by him in the form of greater profits, "on the back end."

Because the agreements of the creditors to participate in the debt restructuring were mutually dependent and Haan's depended, in this way, on the accomplishment of the Merger, the entire debt restructuring was technically contingent on the approval of that transaction. Nevertheless, the debt restructuring became effective in November 1992, subject to being unwound. Moreover, Haan's right to terminate his participation in the restructuring agreement (and, thus, unwind the whole thing) was not easily or speedily exercised. Instead, ITI secured Haan's agreement requiring him to give four month's notice of termination before any

---

5. I also read portions of Haan's original deposition, taken before plaintiffs obtained the documents from Bell Atlantic, as intended to downplay the nature and extent of his contacts with Bell Atlantic during the relevant time period, presumably to divert further inquiry into Bell Atlantic's role.

right to withdraw came into play. Thus, even if the Merger had not occurred, ITI had some ability to find alternative sources of financing or otherwise to stave off the need to file for bankruptcy protection.

In connection with the November 1992 debt restructuring, Haan also sought to protect himself from the possibility of suit over the $8 million WilTel payment. ITI needed to secure Haan's agreement (like that of other secured creditors) to forebear from exercising his rights in default under debt owed by ITI until the vote on the Merger. Haan conditioned his forbearance on the Company's agreement not to bring any action arising out of the transactions that were the subject of the Special Committee Report, if that claim resulted in a final judgment or settlement exceeding $250,000.

With the debt restructuring in place, ITI, despite its financial distress during the spring, realized nearly $3 million of net income for the year 1992.

## P. The Proxy Statement

A proxy statement dated February 10, 1993 was disseminated to ITI's stockholders in connection with a stockholder vote on the Merger, originally scheduled for March 29, 1993. The proxy statement indicated that if there were insufficient votes at the meeting to approve the Merger, the meeting might be adjourned to permit further solicitation of proxies by the Company.

The proxy statement explained the directors' conclusion and recommendation as to the fairness of the merger price, as follows:

> As set forth in the Company's Consolidated Financial Statements, the Company had a shareholders' deficit of $40.9 million at December 31, 1991. Prior to the consummation of the debt restructures described below, the Company had

been in payment default on substantially all of its long-term debt, network services agreements and capital lease obligations during various periods since 1990.... The Company's most recent accounts receivable facility was scheduled to expire on June 24, 1992 (and ultimately expired on July 16, 1992), and the bank lender in that facility indicated its unwillingness to extend the facility. The Company and its financial advisors were *unable at such time to obtain substitute accounts receivable or equity financing or any proposal to acquire the Company from any third party*, other than a proposal from Haan to provide management services and financing through a services agreement with ON-COR.... The Board ... reviewed this proposal as well as the possibility of a voluntary bankruptcy filing, *which the Company believed was the only other alternative available to it.* Without the cash flow provided by the services agreement *in lieu of an accounts receivable facility,* the Company would lack sufficient liquidity to meet its payroll and other debt obligations, notwithstanding its recent operating results. The Board ... obtained the commitment that another corporation wholly owned by Haan would provide the opportunity to the Company's stockholders to receive the Merger Consideration for their shares of Company Common Stock pursuant to the Merger. (emphasis added).

The proxy explained the discussions with Bell Atlantic as follows:

> In discussions with the Company's management during early Spring 1992, one potential lender initially expressed preliminary interest in providing new accounts receivable financing but was not willing by itself to provide the amount of such financing required by the Company. Such lender indicated that it need-

ed a partner to join with it to provide such financing and that such financing could not be in place before the June 24th expiration date. In addition, such lender indicated that it would require Haan to pledge, at a minimum, a $5.0 million certificate of deposit, which Haan indicated that he was unwilling to provide.

Consequently, in late May 1992, with the expiration of the Company's accounts receivable financing approaching, the Board authorized and directed the Company's management to investigate and make recommendations for Board action on all potential alternatives available to the Company.... In the ensuing weeks, certain members of the Board and the Company's management, as well as the Board's financial advisor, contacted numerous third parties to determine whether any of such third parties would be interested in providing an equity infusion to, or purchasing all or part of the assets of, the Company.... In addition, the Company's management continued to seek a lender to provide accounts receivable financing.... None of the entities contacted was willing to finance the Company unless and until the Company improved its financial condition.

**Q. The Initial Shareholder Meeting is Adjourned**

At the board meeting on March 29, 1993, Haan proposed "that if the required majority vote of outstanding shares of ITI stock is not voted in favor [of] the Agreement and Plan of Merger at the Special Stockholders meeting on March 29, 1993 that such meeting be rescheduled to be held on March 31, 1993."

At the shareholder meeting later that day, an insufficient number of ITI shares were voted in favor of the Merger. Before the vote could be finalized, however, the meeting was adjourned and rescheduled for March 31, 1993. Over the next two days, the Company solicited additional proxies so that on March 31, 1993, the Merger was approved by the affirmative vote of 51.91% of ITI's outstanding shares, including the shares owned by Haan.

**III. DISCUSSION**

The plaintiffs' claim, at its core, is that (1) Haan's subversion of ITI's negotiations with Bell Atlantic in May–June 1992 and (2) Haan's failure to disclose those actions to the board, constitute breaches of his duty of loyalty that resulted in and ineradicably tainted the Services Agreement, the debt restructuring and the Merger. As a remedy, plaintiffs seek rescissory damages equal to the fair value of their ITI shares. Plaintiffs also urge the Court to exercise its authority to order disgorgement of Haan's approximately $60 million of post-merger profits. Finally, the plaintiffs seek disgorgement of the $8 million paid by WilTel to Haan in consideration of Haan causing ITI to enter into a network services agreement with WilTel.

Haan argues that the Company was failing and that his actions—even if disloyal—caused no harm because shareholders would have received nothing in bankruptcy. While it is reasonable to conclude that the ITI common equity would have been worthless in a Chapter 11 proceeding, the record shows that the Company's imminent bankruptcy risk would have passed if ITI secured a new source of accounts receivable financing. Moreover, Hyatt testified that receivables financing would make it possible for ITI to restructure its long-term debt. No doubt, as the terms of the proposed Bell Atlantic refinancing suggested and events proved, these steps would have been interdependent and difficult to accomplish. But the record does not support Haan's suggestion that they

were impossible or that the ITI equity was (as a consequence) worthless.

It cannot be judged how likely it is that alternative financing could have been obtained or would have resulted in a debt restructuring and return to profitability. Haan's actions make it impossible to know what *would have* happened if he had acted in accordance with his fiduciary duties instead of his personal economic interests. What can be said is that Bell Atlantic presented *some* financing opportunity for ITI. For this reason and the reasons discussed in greater detail below, I find that Haan breached his fiduciary duty of loyalty to the shareholders of ITI.

## A. The Court Will First Resolve the Fiduciary Claims

■ The Supreme Court made clear in *Cede & Co. v. Technicolor, Inc.* that, in trying this consolidated fraud and appraisal action, the Chancery Court should first evaluate the fraud claims. Del.Supr., 542 A.2d 1182, 1191 (1988) ("Cede I"). The Court will determine whether the Merger was entirely fair to ITI's shareholders. If I conclude that it was entirely fair, the plaintiffs' statutory appraisal remedy will be the sole means of establishing a fair value for the shares of the dissenters. *Id.* If the Merger was not entirely fair, in contrast, other forms of equitable relief are available. For example, the "Court of Chancery may incorporate elements of rescisso-

ry damages into its determination of fair price if it considers such elements: (1) susceptible to proof; and (2) appropriate under the circumstances." *Cede & Co. v. Technicolor, Inc.*, Del.Supr., 634 A.2d 345, 371 (1993) ("Cede II"); *In re Tri–Star Pictures, Inc., Litig.*, Del.Supr., 634 A.2d 319, 333 (1993); *accord Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701, 714 (1983). The inquiry is structured so that regardless of the Court's substantive findings, the plaintiffs are limited to, and statutorily assured of, a single recovery. *Cede I*, 542 A.2d at 1191.

## B. The Entire Fairness Standard Applies

It is obvious to me that the entire fairness standard governs the Court's review of this matter. Plaintiffs' claim that this standard controls because Haan, though not a majority shareholder, was ITI's controlling shareholder. *See, e.g., Tri–Star*, 634 A.2d at 328. Defendants claim that Haan did not control ITI, and therefore, that the business judgment standard of review should apply. *See, e.g., Aronson v. Lewis*, Del.Supr. 473 A.2d 805, 816 (1984); *Pogostin v. Rice*, Del.Supr., 480 A.2d 619, 624 (1984). I find that whether Haan controlled ITI, either by his shareholdings or through other means of influence, is not material to a finding that the entire fairness is the proper standard for this Court to review the alleged wrongdoing.[6]

---

**6.** Although establishing that Haan is a controlling shareholder is not necessary in this case, I note certain facts which color the relationship between Haan and the other directors.

The Report regarding the Haan–WilTel agreements indicate that, *even before he became ITI's CEO, chairman and president,* "Haan's shareholdings, his right to name a majority of the Board, and his *actual control* of ITI gave him a controlling position." (emphasis added).

Whether Lund, Richardson and/or Thomas were "beholden" to Haan or that they were

"so under [Haan's] influence that their discretion would be sterilized," *Rales v. Blasband*, Del.Supr., 634 A.2d 927, 936 (1993), is a matter of considerable dispute. Much of the plaintiffs' arguments focus on the compensation to these directors, which was paid at Haan's behest. *See, e.g., In re MAXXAM, Del. Ch.*, 659 A.2d 760, 774 (1995); *Rales*, 634 A.2d 927.

Thomas, who had been with ITI since 1988, was party to a consulting agreement with ITI by which he was paid approximately $6,000 per month during 1992, representing 20–25%

■ Even where it initially applies, the business judgment rule is rebutted if there is evidence of disloyalty, including, for example, "the motives of entrenchment, fraud upon the corporation or the board, abdication of directorial duty or the sale of one's vote." *Cede II*, 634 A.2d at 363 (citations omitted). Naturally, the Court's "reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries." *Mills Acquisition Co. v. Macmillan, Inc.*, Del.Supr., 559 A.2d 1261, 1279 (1989). Put simply, if the Court finds facts evidencing disloyalty by the defendant, the business judgment rule is rebutted, and the Court reviews the transaction to determine whether, despite the disloyal act, the transaction is nevertheless entirely fair to the Company's shareholders. *Cede II* at 371 (citing *Smith v. Van Gorkom*, Del. Supr., 488 A.2d 858 (1985)).

■ The evidence shows that Haan committed several acts of disloyalty to ITI. These acts interfered with the other directors' efforts to benefit ITI's shareholders. Haan's disloyal acts are as follows:

- At the May 18, 1992 board meeting, the Special Committee was created for the purpose of finding financing for ITI from, among others, Bell Atlantic. The nature of the financing needed was thoroughly discussed. Haan breached his duty of loyalty by contacting Bell Atlantic immediately afterward with a counterproposal that was—though printed on ITI letterhead—adverse to ITI's financial interests. Even if Bell Atlantic had immediately signed Haan's counteroffer, ITI *would still have needed financing.*
- Haan states that his contacts with Bell Atlantic were intended to find financing for ONCOR, integral to the Services Agreement he later proposed. Haan could not, consistent with his fiduciary duties, contact Bell Atlantic to obtain financing for ONCOR without first obtaining the board's permission to do so. *See generally, Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503 (1939); *Yiannatsis v. Stephanis by Sterianou*, Del.Supr., 653 A.2d 275 (1995).
- It is clear the Special Committee proceeded unaware either of the May 14 Bell Atlantic term sheet or of Haan's later contacts with Bell Atlantic.

of his annual income at that time. The defendants state that due to Thomas' relationship with another company, he had decided that "as soon as [he] had fulfilled [his] job as a board member, [he] needed to no longer consult for ITI." Defendants claim that because Thomas wanted to terminate the consulting relationship, any doubt created by the consulting agreement should not be considered by the Court.

Richardson, a founding director of ITI, was party to a consulting agreement with ITI which would pay him $125 per hour for time spent in his consulting duties. However, Richardson was paid about $5,000 under this temporary arrangement, representing a small portion of Richardson's wealth, including over 174,000 ITI shares that he owned directly or through a corporation of which he was the majority owner.

On January, 7, 1992, the board approved a new employment contract for Lund, which he negotiated with Haan as ITI's representative, and which included the continuation of Lund's salary of between $250,000 and $300,000 during the remainder of 1992 as well as various bonuses to Lund. The $250,000 paid to Lund during 1992 represented over half of his income for that year. Whether this amount differs from his rights under his original employment contract is in dispute.

Finally, although Hyatt was the Company's CFO and not a director, it is worth noting that several months prior to the trial, Haan re-hired Hyatt at a salary of approximately $250,000 per year. This fact, combined with others that are mentioned elsewhere in this opinion, lead me to question the reliability of Hyatt's trial testimony.

Haan's several failures to inform the board of these matters constitutes separately cognizable wrongs.

Finding evidence of a breach of the duty of loyalty sufficient to rebut application of the business judgment rule, I will review the transaction under the entire fairness standard of review, as required by *Cede II*.

## C. Haan Bears the Burden of Proving the Entire Fairness of the Transaction

■ When the entire fairness test applies, the burden of persuasion initially lies with the defendant. *See Kahn v. Tremont Corp.*, Del.Supr., 694 A.2d 422, 428 (1997); *Weinberger*, 457 A.2d at 710; *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985). The burden of proof "may be shifted from the defendants to the plaintiff through the use of a well functioning committee of independent directors." *Tremont*, 694 A.2d at 428; *Kahn v. Lynch Communication Sys.*, Del.Supr., 638 A.2d 1110, 1117 (1994).

■ In this case, the burden remains with Haan and the corporate defendants (even assuming that Thomas, Richardson and Lund were truly independent of Haan) because Haan's misconduct interfered with or corrupted the proper functioning of the Special Committee. In *Rabkin v. Olin Corp.*, then Vice Chancellor Chandler explained the two part test for determining whether the burden of proof should be shifted because of the presence of an independent committee:

> The mere existence of an independent special committee ... does not itself shift the burden. At least two factors are required. First, the majority shareholder must not dictate the terms of the merger. *Rosenblatt v. Getty Oil Co.*, Del.Supr., 493 A.2d 929, 937 (1985). Second, the special committee must have real bargaining power that it can exercise with the majority shareholder on an arms length basis. *Id.*

Del.Ch., Consol. C.A. No. 7547, mem op. at 14–15, 1990 WL 47648, Chandler, V.C., (Apr. 17, 1990), *aff'd*, Del.Supr., 586 A.2d 1202 (1990).

Due to Haan's misconduct, the other directors were not in a position to bargain at arms length with him. Instead, the three directors operated under the assumption that if they failed to reach agreement with Haan as to the Services Agreement and the Merger, ITI was headed directly into bankruptcy. Indeed, Richardson, who the proxy statement indicates was involved in the "discussions" regarding the merger price, stated that there were no "extraordinary negotiations. Mr. Haan told us what he would do, what he was willing to do, and that seemed to be, you know, generally, the only alternative, the only viable alternative we felt we had rather than a bankruptcy." The testimony of the others, when carefully examined, is consistent with this analysis of the situation.

For these reasons, I conclude that Haan must bear the burden of proof on the issue of entire fairness and, for the same reasons, that I will draw all reasonable inferences in favor of the plaintiffs. Thus, to prevail Haan must show by a preponderance of the evidence that Bell Atlantic and ITI would not have come to terms on financing had he not improperly interfered in that relationship. I realize that this involves proving a negative and is a difficult burden for Haan to meet. Yet it is the only fair way to proceed because Haan's misconduct prevented the ITI/Bell Atlantic negotiations from taking their natural course.

## D. The Entire Fairness Analysis

■ There are two components to the concept of entire fairness: fair dealing and

fair price. *Weinberger,* Del.Supr., 457 A.2d at 711. Fair dealing "embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained." *Id.* Fair price "relates to the economic and financial considerations of the proposed merger, including all relevant factors: assets, market value, earnings, future prospects, and any other elements that affect the intrinsic or inherent value of a company's stock." *Id.* In making a determination as to the entire fairness of a transaction, the Court does not focus on one component over the other, but examines all aspects of the issue as a whole. *Id.*

### 1. Fair dealing

■■■■■ The "fair dealing" element of the entire fairness analysis "also embraces the duty of candor owed by corporate fiduciaries to disclose all material information relevant to corporate decisions from which they may derive a personal benefit." *Mills Acquisition Co. v. Macmillan, Inc.,* Del.Supr., 559 A.2d 1261, 1280 (1988); *cf.* 8 *Del. C.* § 144. The duty of candor, integral to fair dealing, "dictates that fiduciaries, corporate or otherwise, may not use superior information or knowledge to mislead others in the performance of their own fiduciary obligations." *Macmillan,* 559 A.2d at 1283. Haan's failure to disclose the Bell Atlantic proposal, the "counterproposal" on ITI letterhead and the subsequent redirection of Bell Atlantic away from ITI is convincing evidence of unfair dealing under this standard.

Haan's disloyal acts are akin to those condemned in *Macmillan.* Evans, Macmillan's CEO and chairman, and Reilly, its president and COO, both of whom were interested in the transaction, interfered with the company's auction process by "tipping off" KKR, the white knight, as to the amount and structure of the hostile bid from Maxwell. The Supreme Court treated the "tip" and the failure to disclose the "tip" at the next board meeting as distinct wrongs. The Supreme Court stated, "there can be no justification for the telephonic 'tip' to KKR of Maxwell's $89 all-cash offer following the first round of bidding. . . . Evan's and Reilly's knowing concealment of the tip at the critical board meeting . . . utterly destroys their credibility. Given their duty of disclosure under the circumstances, this silence is an explicit acknowledgement of their culpability." *Macmillan,* 559 A.2d at 1282 (citations omitted). Haan's actions, as well as his later omissions, similarly establish extreme disloyalty to ITI's shareholders.

### a. Haan's defense to unfair dealing

Haan argues two general justifications: (1) the other directors implicitly authorized and would have applauded Haan's efforts; and (2) since Bell Atlantic was clearly not a financing option for ITI, Haan's actions constituted no wrong to ITI and its shareholders. Neither argument bears analysis.

During his deposition, Haan claimed that the board's May 18 resolution establishing the Special Committee put the search for accounts receivable financing in the hands of the Special Committee "except for the Bell Atlantic negotiations." This claim is refuted by both the minutes of the meeting and the other directors' testimony as to their understanding that Lund and Hyatt were charged with pursuing negotiations with Bell Atlantic. There is also no suggestion in the May 18 board minutes or in the directors' testimony that the directors knew that Haan planned to contact Bell Atlantic, either to secure financing for ITI or to obtain support for his proposal. Indeed, the directors' actions at the May 18 meeting refute any claim that

they knew of or would have supported Haan's planned course of action. The very reason the directors established the Special Committee was to isolate Haan (who was perceived to be interested) from the Company's continued search for alternatives, including financing. Under the circumstances, Haan's suggestion that the other directors "would have applauded" his secretive and disruptive contacts with Bell Atlantic reflects merely his disrespect for the norms of fiduciary behavior.

The second line of defense is immateriality. Haan argues that whether or not he breached his fiduciary duties makes no difference because Bell Atlantic would not have lent to ITI in any case. Among other things, Haan points to Bell Atlantic's demand that he guarantee the loan, something he was not legally obliged to do. *See Odyssey Partners, L.P. v. Fleming Cos.*, Del.Ch., C.A. No. 14770, mem. op. at 7, 1996 WL 422377 at *3, Allen, C. (July 24, 1996) ("[f]iduciary obligation does not require self-sacrifice"). Making this argument, Haan testified at trial that "there was no chance that ITI by itself could get the financing, so that I was not in any way taking an opportunity that was ITI's and taking it for myself or making it difficult for ITI to then get the financing because I had put a better proposal in front of Bell Atlantic."

How am I to analyze this contention? Whether Bell Atlantic would have financed ITI was a matter of uncertainty until Haan interfered with the dealings between ITI and Bell Atlantic. Bell Atlantic responded to the May 14 meeting by proposing a new set of terms that more nearly satisfied ITI's financing needs. Although signifi-

cant hurdles remained, these terms were fully negotiable. It was Haan's faithless behavior thereafter that makes it difficult to know with any degree of certainty whether or not ITI could have worked out a deal with Bell Atlantic.

Although I cannot conclude that a deal with Bell Atlantic was probable, the evidence shows that there was some likelihood of such a deal before Haan's interference. Cole indicated that Bell Atlantic would consider making the loan if a guarantee were provided by someone other than Haan. Cole also testified that Bell Atlantic would not send a proposal contemplating a lending partner unless it believed that such a partner was attainable. Most importantly, as discussed in Section II, N, *supra*, Haan's efforts to conceal his Bell Atlantic contacts betray his guilty knowledge that those contacts had a material impact on ITI's search for financing.[7] In sum, the record, when viewed as a whole, supports the conclusion that there was *some* likelihood of ITI and Bell Atlantic reaching an accord. Moreover, the record clearly supports the conclusion that it was Haan's misconduct in regard to Bell Atlantic that sunk any chance that ITI had of obtaining financing from that source.

### b. Other factors

My analysis of the factors articulated in *Weinberger* also supports a finding of unfair dealing. On balance, the structure, initiation or timing of the Merger does not weigh much in this entire fairness analysis. The Merger was structured as an all cash transaction for all shares and, thus, was not economically coercive in that respect. At the same time, it was linked to the debt

7. As mentioned, in *Macmillan*, the Supreme Court stated that the defendants' knowing concealment of their wrong destroyed their credibility. 559 A.2d at 1282. The Court also pointed out that the defendants' later effort to

trivialize their misconduct stood in contrast to their allegedly innocent intentions. *Id.* at n. 30. Those observations apply equally in this case.

restructuring and presented as the only viable alternative to bankruptcy. These facts are suggestive of unfairness. The timing of the Merger seems dictated by the economic circumstances of the Company, and there is no suggestion that it was timed to disadvantage the Company's shareholders. Similarly, the evidence supports the conclusion that the concept of the Merger was first raised by the Special Committee, not by Haan. Even if this were not the case, I would not regard it as evidence of unfairness on Haan's part.

Other of the *Weinberger* procedural factors, for reasons already discussed at length, strongly indicate a lack of fairness in the process followed. These include the misinformation given to the Special Committee and the resulting absence of meaningful negotiations over the terms of the Merger. I have already discussed my conclusion that the Special Committee was materially misled by Haan's improper activities and lack of disclosure. I need only add that, as a consequence of Haan's faithless conduct, the stockholders were also deprived of critical information regarding Haan's contacts with Bell Atlantic. A central, if not primary, reason offered by the proxy recommending shareholder acceptance of the $0.30 per share price was that ITI and its financial advisors "were unable [in May–June 1992] to obtain substitute accounts receivable or equity financing . . . other than a proposal from Haan to provide . . . a services agreement with ON-COR." The omission of any information about Haan's contact with Bell Atlantic on or after May 18, 1992 and about his failure to disclose those contacts to the Board of Directors renders this (and other) parts of the Merger proxy statement materially

misleading. *See Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 650 A.2d 1270, 1277 (1996) (stating that a fact is material and must be disclosed if a reasonable stockholder would consider the fact important in deciding how to vote).

The plaintiffs also attack the method of obtaining shareholder approval on several grounds. First, the initial shareholder meeting of March 29, 1993 was adjourned and rescheduled when the requisite vote could not be obtained. The decision to adjourn was made by the board on the morning of the meeting. Although the minutes of the meeting reflect that Haan proposed the adjournment, he testified at first that he opposed the idea. Regardless, the proxy statement stated clearly that the meeting might be adjourned if the requisite vote were not obtained. I find no unfairness in doing so.

Finally, plaintiffs argue by analogy to the decision of the Supreme Court in *Cinerama v. Technicolor, Inc.* that the fact that the Merger received only a bare majority of the stockholder vote is evidence of its unfairness. Del.Supr., 663 A.2d 1156 (1995). The analogy is inapt. The Supreme Court in *Cinerama* held that an overwhelming vote in favor of a transaction is evidence of fair dealing. *Id.* at 1176. There is no logical force to the suggestion that the obverse is also true. In any case, it is hard to see how compliance with a statutory mandate could ever be part of a showing of unfairness.[8]

### 2. *Fair price*

■ The Supreme Court has made clear that the entire fairness analysis,

---

**8.** Finally, plaintiffs also contend that the proxy statement included blatant threats that the company would file for bankruptcy if the merger did not get approved. Under *Williams v. Geier,* such threats would be evidence of wrongful coercion of the vote. Del. Supr., 671 A.2d 1368, 1382–83 (1996). I find that the statements regarding bankruptcy were presented neutrally and not in a threatening way. *Id.* at 1383.

though structurally bifurcated, is conceptually singular. All aspects of a transaction are considered in determining whether the challenged transaction is entirely fair. *Kahn v. Tremont*, Del.Supr., 694 A.2d 422, 432 (1997).

Defendants urge the Court to conclude that $0.30 per share was more than adequate compensation to ITI's shareholders at a time when their shares were arguably worthless. Because the debt restructuring may have come undone had the shareholders voted down the Merger, the defendants argue that ITI's "fair value" at the time of the Merger cannot reflect the benefits of that restructuring. Thus, in essence, they argue that "fair value" of the shares should be determined as if the agreements of Northern Telecom, WilTel and the Haan entities to reduce ITI's debt load had not been reached and put into effect in November 1992.

I agree that without the debt restructuring, ITI's shares had little or no value. Kane & Co., who rendered a fairness opinion as to the Merger consideration, and Mr. Much, the defendant's expert witness, both valued ITI without taking account of the debt restructuring. Both Kane and Much concluded that ITI's shares had negligible value, due critically to its high pre-restructuring debt load.

■ I do not agree, however, that the debt restructuring can be ignored in assessing the fairness of the Merger price. In *Tremont*, the Supreme Court reviewed Chancellor Allen's carefully deliberated fair price analysis, giving "considerable deference [to] his selection among the various methodologies offered by competing experts." 694 A.2d at 432. The Supreme Court then stated that "here, the process is so intertwined with price that under *Weinberger's* unitary standard a finding that the price negotiated by the Special

Committee might have been fair does not save the result." *Id.*

Here, as in *Tremont*, the unfairness of the process also infects the fairness of the price. Had ITI received alternative financing, the evidence supports the conclusion that it would have been able to restructure its debt. Had it succeeded in doing so, there is no reason to believe that the directors would have considered $0.30 per share (or $5 million in total) a fair price. Thus, because Haan's alleged ability to unwind the debt restructuring is related to his breaches of the duty of loyalty, I conclude that I should value ITI without regard to Haan's claimed ability to unravel the debt restructuring. I note that were this an appraisal action, I might reach a different result on this issue, as I would not be concerned by the relationship between the conditional nature of the debt restructuring and Haan's breach of fiduciary duty. *See, e.g., Application of Vision Hardware Group., Inc.*, Del.Ch., 669 A.2d 671 (1995), *aff'd*, Del.Supr., 676 A.2d 909 (1996).

#### 3. Conclusion as to entire fairness

Taking all factors into account, I conclude that Haan and the other defendants have failed to carry their burden of proving that the Merger was entirely fair to the shareholders. Haan's failure to disclose material facts and his diversion of Bell Atlantic away from ITI infected all subsequent events, thus rendering ineffectual the procedures employed by the other directors to ensure an independent and fair process and result.

### E. The Plaintiffs' Remedy

Plaintiffs seek a combination of equitable remedies. First, plaintiffs demand rescissory damages to recoup the fair value of the shares taken from them in the Merger. Second, they ask for disgorge-

ment of some or all of the $8 million that Haan obtained as consideration for inducing ITI to enter into the WilTel agreement, any such amount to be treated as a non-operating asset of ITI for purposes of determining rescissory damages. Finally, the plaintiffs allege that Haan made about $60 million from ITI in the five years following the Merger. At trial, Haan testified that he could not say that he would have made any of that money if not for the Merger. On this basis, plaintiffs ask this Court to disgorge some or all of the $60 million. I address each of these contentions separately.

■ Before turning to these matters, however, some general observations are in order about the process of assessing damages in cases of this nature. First, significant discretion is given to the Court in fashioning an appropriate remedy. In determining damages, the Court's "powers are complete to fashion any form of equitable and monetary relief as may be appropriate...." *Weinberger*, 457 A.2d at 714.

■ Second, unlike the more exact process followed in an appraisal action, the "law does not require certainty in the award of damages where a wrong has been proven and injury established. Responsible estimates that lack mathematical certainty are permissible so long as the Court has a basis to make a responsible estimate of damages." *Red Sail Easter Limited Partners, L.P. v. Radio City Music Hall Prods., Inc.*, Del.Ch., C.A. No. 12036, mem. op. at 12, 1992 WL 251380, Allen, C., (Sept. 29, 1992); *see also Thorpe v. CERBCO, Inc.*, Del.Ch., C.A. No. 11713, 1993 WL 443406, Allen, C. (Oct. 29, 1993), mem. op. at 24 ("so long as the court has a basis for a responsible estimate of damages, and plaintiff has suffered some harm, mathematical certainty is not required").

■ Third, where, as is true here, issues of loyalty are involved, potentially harsher rules come into play. "Delaware law dictates that the scope of recovery for a breach of the duty of loyalty is not to be determined narrowly.... The strict imposition of penalties under Delaware law are designed to discourage disloyalty." *Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436, 445 (1996) (relying on *Guth v. Loft, Inc.*, Del.Supr., 5 A.2d 503, 510 (1939)).

### 1. The value of the shares taken in the Merger

■ Because of the nature of the wrongs committed here, it is not a sufficient remedy to award plaintiffs their pure out-of-pocket damages, at least as measured (as defendants insist I must) by the fair market value of ITI at the time of the Merger without giving effect to the debt restructuring. So valued, plaintiffs' shares are worthless or nearly so. Instead, what plaintiffs are entitled to receive is, at a minimum, what their shares would have been worth at the time of the Merger if Haan had not breached his fiduciary duties. Of course, this value is inherently unknowable because there is no way to learn what financing arrangements ITI might have made in the absence of Haan's disloyal conduct. In the circumstances, I conclude that the only good way to approximate that value is to value ITI as of the time of the Merger with the Services Agreement and the debt restructuring agreement in place but without giving effect to any contingency Haan attached to them. This is what I will do.

■ I recognize that before Haan acted disloyally there was uncertainty whether or not ITI could secure financing and restructure its debt and, also, that the measure of damages I mean to allow removes these uncertainties and might over-

compensate plaintiffs for that reason. Nevertheless, I conclude that the potentially harsh nature of this remedy is both appropriate, given the nature of Haan's misconduct, and necessary to avoid short-changing plaintiffs.[9]

Plaintiffs presented expert testimony of Dr. Donald J. Puglisi valuing ITI by the comparable companies method of analysis. Before accounting for the value of non-operating assets, plaintiffs' expert valued ITI at either $2.74 per share or $5.54 per share, depending on whether or not it is assumed that Haan exercised his warrant to purchase over 26 million ITI common shares at $.25 per share. They argue that I should ignore the evidence that Haan would exercise his warrant and award damages based on the higher value. Plaintiffs rely on other evidence valuing the non-operating assets at approximately $6.6 million, consisting of a $1.25 million value for the Company's net operating loss carry forward ("NOL") and $5.33 million for the value of the claim against Haan to recover the $8 million WilTel payment. Because it is not disputed, I accept $1.25 million as the value of the NOL. I address the value of the claim *infra.*

The defendants expert used the discounted cash flow method of analysis and concluded that the ITI shares had no (or nominal) value at the time of the Merger.

Because there were no projections beyond one-year forecasts prepared in connection with the annual budget process, defendants' expert prepared his own set of projections, strictly for the purposes of this litigation. To do so, he extrapolated management's one-year forecast for a period of five years, assuming a 10% decrease in revenues (and a concomitant reduction in costs) in each year. While this process may appear reasonable in light of ITI's actual experience in the years following the Merger, it is not supported by the contemporaneous expectations of management. For that reason, I find this methodology too unreliable to use in my damage calculation. *Harris v. Rapid–American Corp.,* Del.Ch., C.A. No. 6462, mem. op. at 14, 1990 WL 146488, Chandler, V.C. (Oct. 2, 1990); *In re Radiology Associates, Inc., Litig.,* Del.Ch., 611 A.2d 485, 490–91 (1991).

Defendants also attack Dr. Puglisi's expert testimony and report on several fronts. First, they complain that the comparable companies he used in his analysis are insufficiently comparable. They then challenge his application of a 30% premium to account for the minority discount inherent in the comparable companies analysis. Next, they claim that he erred in failing to adjust his valuations downward to account for ITI's $11 million working capital deficit.[10] Finally, they argue that I should

---

9. I regard this way of calculating plaintiffs' damages as a species of rescissory damages. Rescission is not an available remedy because no mechanism is available to restore the plaintiffs or ITI to the position they would have been in had Haan not acted disloyally. Thus, "the equitable remedy of rescission is impractical." *Lynch v. Vickers Energy Corp.,* Del.Supr., 429 A.2d 497, 501 (1981), *overruled in part on other grounds, Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983). Moreover, because Haan's misconduct in the May – June 1992 timeframe injured ITI and devalued its shares, it is insufficient, as a remedy, to award only out-of-pocket damages

measured by the actual value of ITI's shares at the time of the Merger. *Weinberger,* 457 A.2d at 714.

10. For reasons I have already stated, I reject defendants' further argument to include the amount of debt eliminated in the debt restructuring. I also reject their complaint that Dr. Puglisi's analysis is defective because of a "mismatch of earnings periods." While this might present a greater problem in the context of an appraisal action, it is not apparent to me that this "mismatch" materially affects the damages calculation.

account for the dilutive value of the stock warrant issued to Haan in 1991 but never approved by the ITI stockholders, more than doubling the number of outstanding shares for valuation purposes. I will discuss these contentions in turn.

*The comparable companies.* Kane also used the comparable companies method of analysis in preparing his fairness opinion for the ITI board of directors and included, as comparable companies, essentially the same ones used by Dr. Puglisi. In the circumstances, I cannot accept defendants' objection to Dr. Puglisi's method of analysis or his choice of comparable companies. I do recognize that the group of comparables includes companies of substantially different size and scope than ITI but conclude that these differences are properly reflected in adjustments made to the multiples derived for comparative purposes.

*The control premium.* Defendants do not dispute that the value derived by comparable companies method of analysis reflects an imbedded minority discount. Instead, they argue that no one would have paid a control premium to acquire ITI due to "its reliance on the Services Agreement and its distressed financial condition." Because both the Services Agreement and, to some extent, ITI's distressed financial condition stem from Haan's breach of fiduciary duty, I reject the suggestion that no control premium should be added to determine value. Indeed, even if I recognized that control had already passed to Haan, plaintiffs are entitled to be paid the fair value of their shares without a minority discount. *See Cavalier Oil Corp. v. Harnett,* Del.Supr., 564 A.2d 1137, 1144 (1989).

*The working capital deficit.* I agree with defendants that Dr. Puglisi's valuation should be adjusted to reflect ITI's $11 million working capital deficit. This approach is consistent with, if not required by, authority of this court holding it proper to *increase* valuations to reflect excess working capital. *See Radiology Associates,* 611 A.2d at 495. Defendants' expert, Mr. Much, determined that there was an $11 million working capital deficit and subtracted that amount in arriving at fair value. Plaintiffs do not dispute this work. Instead they argue only that "Mr. Much did not critique Dr. Puglisi's report" and "Dr. Puglisi's testimony is unrebutted." These arguments do not meet the merits of the objection.

*The stock warrant.* The final issue I need to address before arriving at a damage figure is whether or not to treat Haan's warrant as though it were exercised. I conclude that I should not because Haan's right to exercise this warrant was expressly made subject to a vote of the ITI stockholders that was never obtained.

If I were to value ITI on the basis of Dr. Puglisi's analysis, without any adjustments to his work beyond those already described, I would derive a damage calculation of approximately $5.05 per share.[11] In

11. For those readers interested in the math, I calculate this figure by multiplying Dr. Puglisi's multiplier (8.5x) times $15.75 million, the mid-point of his range of ITI's "true annual earnings capacity"—$14 million to $17.5 million—and then subtracting from that amount the value of ITI's interest bearing debt ($36.9 million). This produces a result of $96.98 million. That amount is then increased by the 30% control premium to approximately $126.07 million and reduced by the $11 million working capital deficit. Finally, I add $1.25 million, the value of ITI's NOL. The resulting value of ITI's total invested capital, $116.32 million, is then divided by 23.015 million, being the number of shares outstanding assuming the exercise of all options and

my opinion, however, I must make a further adjustment to account for the differences in growth expectation between ITI and the group of comparables.

Dr. Puglisi testified that there is an expectation of growth built into the comparables he used. For example, in the case of AT & T, its long term expected growth rates were "[s]omewhere about the growth of the economy as a whole." He also testified that if the prospects for growth at ITI were lower than for the comparables or for the aggregate of the sample, it would be appropriate to make an adjustment for such differences. Because he "saw nothing in the information that was presented to [him] in terms of management-prepared forecasts that would indicate that an adjustment was in order," he made no such adjustment in his work.

On the basis of the trial record, I am satisfied that growth prospects for ITI at the time of the Merger were significantly lower than for the companies included in Dr. Puglisi's sample. Making a "realistic assessment" of the adjustment necessary to account for this signal difference between ITI and the group of comparable companies requires, in my judgment, a 50 percent downward adjustment to Puglisi's average multiple (8.5x). Using 4.25x as the multiple produces a fair value per share of $1.27, including the value of the NOL, but excluding the value of the claim against Haan relating to the $8 million WilTel fee. I will next address the value of that claim.

### 2. The $8 million claim against Haan

As discussed above, Haan got $8 million from WilTel in payment for ITI's agreement to enter into the network services agreement with WilTel. Plaintiffs claim that this amount was obtained in violation of Haan's duty of loyalty and suggest that disgorgement to ITI of $5.33 million [12] of that amount would be the proper remedy, under the Supreme Court's ruling in *Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436, 445 (1996).

■ My analysis of this matter requires that I answer three questions: (1) what is the legal effect of the Report of the special review committee declining to proceed against Haan on account of this fee? (2) what is the legal effect of Haan's contractual right to terminate his agreement to forebear if any litigation based on the WilTel transactions resulted in a final judgment or settlement totaling more than $250,000?, and (3) if the claim survives the Report and the "forbearance condition," how should it be valued and what are plaintiffs' damages?

### a. The Report

There is little question that ITI had a strong claim against Haan for breach of his duty of loyalty in connection with the $8 million WilTel payment. Simply stated, WilTel paid Haan an $8 million fee to secure ITI's participation in the new network servicing agreement. Haan made this deal with WilTel after he entered into the MOA with ITI. At the time he secured ITI's participation in that agreement, Haan was ITI's Chairman and CEO. Haan did not disclose his interest in the transaction when he presented it to the ITI directors for their approval and they did not otherwise learn of it before voting. Without some further, substantial explanation,

---

warrants other than Haan's, to produce a per share fair value of $5.05.

**12.** Plaintiffs reduce the $8 million payment to $5.33 million to account for the likely costs, including attorney's fees, ITI would have incurred in recovering a judgment against Haan for the $8 million.

the law would seem to require Haan to disgorge the fee to ITI. *See Thorpe v. CERBCO, Inc.*, Del.Supr., 676 A.2d 436, 445 (1996) ("once disloyalty has been established" the law "require[s] that a fiduciary not profit personally from his conduct.")

The Report acknowledges that the terms of his agreement with WilTel placed Haan in a position of conflict and that he aggravated his conflict by "using his own personal counsel to help him negotiate the [WilTel/ITI] deal and by limiting the participation of ITI management personnel."[13] The Report also concludes, in effect, that Haan had a duty to disclose his arrangement with WilTel to his fellow directors on several occasions and failed to do so. Haan did disclose the terms of his fee arrangement in his bankruptcy court testimony but that testimony could not be heard by the ITI representatives present and was never reported to the ITI board of directors. Nevertheless, the Report concludes that "ITI was not harmed by WilTel's willingness to pay Haan $13 million for the assets [i.e., $5 million for the assets and the $8 million fee] and other undertakings he provided under the Haan–WilTel Agreement." The Report reaches this conclusion by examining the terms of the WilTel/ITI agreement, which it determines to be fair.

The Report's conciliatory treatment of Haan (accepted by the special review committee and the board of directors) may be largely explained by its timing. The Report is dated June 15, 1992, and was presented to the board of directors at the same meeting (held on June 19, 1992) at which Haan presented his proposal for the Services Agreement. It would seem inescapable that the Report's recommendation

that ITI not proceed against Haan was influenced by the fact that, by mid-June 1992, Haan appeared to be the only person ready to provide the financing ITI needed to avoid a ruinous bankruptcy filing. No doubt Haan and his counsel also strongly maintained that he had earned the fee as his compensation for finding and arranging the multi-legged transaction among ITI, WilTel, Haan-controlled entities and the Telesphere bankruptcy estate.

In any event, the Report's legal conclusion misses the point. Under Delaware law, the fact that the deal may have benefited ITI is not dispositive of whether Haan's disloyal acts entitled ITI to recover the fee from him. The Supreme Court's ruling in *Thorpe* restates the fundamental principal that a disloyal fiduciary is not entitled to profit from his breach. 676 A.2d at 445 (citing *Guth v. Loft, Inc.*, Del. Supr., 5 A.2d 503, 510 (1939)).

### b. The "forbearance consideration"

Because the Board's actions in June did not lay to rest the $8 million claim, Haan later conditioned his agreement to forebear from exercising certain creditors rights until the Merger vote on the Company's agreement not to bring any action arising out of the WilTel transactions if that claim resulted in a final judgment or settlement exceeding $250,000. He argues that the WilTel claim cannot now be valued at more than $250,000 because the Company has, in effect, released any claim in excess of that amount. I conclude that I must ignore the particular terms of this agreement in determining the amount of damages to award. My reason for doing so is that the forebearance agreement is itself tainted by what I have found to be Haan's breach of the duty of loyalty in his

---

13. The Report even indicates that the ITI board believed that Haan's lawyers, who assisted in negotiating with WilTel, were working on behalf of the Company when in fact, they were representing Haan in his personal capacity.

dealings with Bell Atlantic. The specific terms of that agreement are a further consequence of the directors' inability to secure an adequate source of receivables financing apart from the Services Agreement.

### c. *Valuing the claim*

■ Before turning to this issue, I must address a procedural point raised by defendants. In an early opinion in the appraisal aspect of these consolidated actions, then Vice Chancellor (now Justice) Berger ruled that the claim relating to the $8 million WilTel fee was properly plead because it was a potential element of share value. She also ruled that the underlying claims would not themselves be tried in the appraisal action but, rather, "the value of the claims, if any, will be established through expert testimony in much the same manner that evidence typically is presented as to the value of other corporate assets." *Bomarko v. International Telecharge, Inc.*, Del.Ch., C.A. No. 13052, mem. op. at 6, 1994 WL 198726, Berger, V.C. (May 16, 1994). Defendants argue that the plaintiffs' failure to present expert testimony at trial concerning the value of the derivative claim should prevent the Court from assigning any value to it.

I disagree with defendants' argument. Justice Berger's ruling came before the Report was made part of the record and before the fiduciary duty action was even filed. At trial, the Report was admitted into evidence and, I am satisfied, supplies sufficient information, without the aid of expert testimony, upon which to base a reasonable estimate of the value of the claim. Moreover, my assessment of the value of that claim is not made in the context of the appraisal action but, rather, as part of my analysis of the proper measure of damages for breach of fiduciary duty. In the context of that undertaking, I am certain that Justice Berger's early opinion does not preclude my consideration of the Report.

So, what was the claim worth? I value the claim by multiplying (a) my assessment of the probability of success on the merits by (b) the likely amount of a favorable recovery, and subtracting from that result (c) the reasonable costs ITI would have incurred in prosecuting the claim.[14] I conclude that there was a .8 probability of success on this claim. I discount the outcome only to weigh the inevitable uncertainty of litigation and the chance that the forebearance agreement might be upheld. The likely recovery was $8 million. This produces a gross potential recovery of $6.4 million. It seems to me unlikely that the Company would have to pay more than 15% of that amount in fees and expenses to secure the services of competent counsel in a case of this unusually strong merit. Thus, I arrive at a value of $5.44 million for the claim. Plaintiffs will be awarded 9.48% of this amount, or $515,712 in dam-

---

**14.** I recognize that, had Haan acted in conformity with his fiduciary obligations, he might have been able legitimately to negotiate a reasonable compromise of this claim in return for some other economic concessions on his part, e.g. in connection with the debt restructuring. Nevertheless, I am unable, without rank speculation, to determine what the results of such a negotiation might have produced. Unlike some other cases, there are no guideposts in the record to show me the way. *See, e.g., HMG/Courtland Properties, Inc. v. Gray*, Del.Ch., C.A. No. 15789, mem. op. at 65–69, 749 A.2d 94, Strine, V.C. (July 12, 1999) (crafting a remedy that approximates the result that would have obtained in the absence of a breach of duty) *and Boyer v. Wilmington Materials, Inc.*, Del.Ch., C.A. No. 12549, mem. op. at 53–56, 754 A.2d 881, Lamb, V.C. (January 20, 1999) (assessing damages on breach of duty of loyalty claim where evidentiary basis existed to approximate likely course of negotiation).

ages for the value of this claim. This comes to $0.24 for each of plaintiffs' 2,181,-682 shares.

### 3. The claim for disgorgement of profits

Finally, plaintiffs ask for disgorgement of the $60 million that they claim Haan made from ITI in the five years after the Merger. They rest their claim on the sound public policy that it is better to give a windfall to a beneficiary that to let a faithless fiduciary benefit from his wrongdoing. *Thorpe*, 676 A.2d at 445 (citing *Guth*, 5 A.2d at 510).

■ This claim fails. There is simply no evidence here that Haan realized a "windfall" from the Merger that is not remedied (at least insofar as these plaintiffs are concerned) [15] by my award of damages. Putting it differently, there is no evidence in this record that plaintiffs shares were more valuable on any date after the Merger. Thus, in awarding them damages equal to the value of their shares at the time of the Merger, I have given them all they are entitled to receive.

The situation might have been different if, for example, the market multiples for 0+ corporations increased substantially within a short period after the Merger. In that case, I would have calculated the fair value of the plaintiffs' shares at that time rather than at the time of the Merger. *See Weinberger v. UOP, Inc.*, Del.Ch., C.A. No. 5642, mem. op. at 6, 1985 WL 11546, Brown, C. (Jan. 30, 1985), *aff'd*, Del.Supr., 497 A.2d 792 (1985). Thus, the economic windfall of increased values would go to the beneficiary instead of the faithless fiduciary. On the record before me, however, there is no indication that Haan's re-

ceipt of monies after the Merger was on account of factors other than the Merger and the debt restructuring. Because my valuation of ITI already takes into account the benefits of the debt restructuring and, as to these plaintiffs, deprives Haan of the value of the Merger, any order requiring disgorgement would constitute a double recovery for the plaintiffs.

### F. Prejudgment Interest

■ Delaware law is settled that "[a] successful plaintiff is entitled to interest on money damages as a matter of right from the date liability accrues." *Summa Corp. v. Trans World Airlines, Inc.*, Del.Supr., 540 A.2d 403, 409 (1988). In fixing the rate of interest, I have "broad discretion, subject to principles of fairness." *Id.* The only record evidence relating to the question of interest is Dr. Puglisi's report and testimony in which he presented a range of three rates: the legal rate (8.0%), ITI's cost of borrowing (8.74%), and ITI's cost of equity (11.12%). Plaintiffs ask that I allow calculate interest based only on the highest of these rates.

I decline to do so. Instead, as defendants suggest, I will allow prejudgment interest at a rate equal to the average of the legal rate and ITI's cost of borrowing, or 8.37%, calculated from the effective date of the Merger. Because I am required to do so by precedent, I direct that the calculation be done without compounding.

### IV. CONCLUSION

For all the foregoing reasons, I award plaintiffs the sum of $1.51 per share for each of the 2,181,682 common shares of ITI held by them as of the effective date of

---

**15.** It bears noting that this is not a class action and these plaintiffs owned less than 10% of the ITI common stock, on a fully diluted basis. Plaintiffs do not address the issues raised by the individual nature of this action and the "class action-like" relief they seek.

the Merger, plus 8.37% simple interest from that date until the date judgment is entered. Counsel for plaintiffs is directed to submit an order, on notice, within 10 days.